IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| BRANCH BANKING AND TRUST COMPANY, successor in interest to Colonial Bank by acquisition of assets from FDIC as Receiver for Colonial Bank, | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:08cv955-MHT |
| | ) | (WO) |
| SYNTELLECT, INC., a Delaware corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

Plaintiff Branch Banking and Trust Company ("BB&T"), is pursuing this lawsuit against defendant Syntellect, Inc., claiming breach of contract and fraud. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on BB&T's motion for partial summary judgment and Syntellect's cross-motion for summary judgment. For the reasons that

follow, BB&T's motion will be granted and Syntellect's motion will be denied with respect to the breach-of-contract claim and granted with respect to the fraud claim.

## I.   SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  In conducting its analysis, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II.   BACKGROUND

Colonial Bank initiated this lawsuit against Syntellect.  The court has since granted BB&T's motion to

substitute itself "as the real party in interest in this action."  Mot. to Substitute at 1 (Doc. No. 46-1).[1]

This lawsuit has its origin in a series of agreements between Colonial and Syntellect, the developer of an interactive voice response ("IVR") product called Vista. At some point prior to January 12, 2001, Colonial issued a request for proposal ("RFP") to several vendors, including Syntellect.  The RFP stated that:

> "Colonial Bank is seeking a solution to handle its current IVR functionality plus the transfer of funds capabilities. [Specifically, it seeks to] ... [a]utomate the functionality of the following features that currently transfer to an agent: checking rates, savings rates, CD rates, IRA rates. [It also seeks to] [a]dd the functionality of funds transfer."

RFP at 4 (Doc. No. 90-3).[2]

------------------------

1.   In its motion to substitute, BB&T contends that it is the "successor in interest to Colonial Bank by asset acquisition from the Federal Deposition Insurance Corporation."  Id. at 1.

2.   At the time it issued the RFP, Colonial was using (continued...)

3

In its response to Colonial's RFP, Syntellect offered
its Vista IVR product, explaining that Vista "allows a
business to provide automated self service 24-hours a
day, 7-days-a-week." <u>Id</u>. at 5.[3]  Syntellect's "Computer
Telephony Integration" was described as "bring[ing] voice
and data together for seamless integration between
automated self-service systems and agent supported
services." <u>Id</u>. at 5-6.  In documents later provided by
Syntellect to Colonial, it further explained that, "The
Vista IVR <u>automates</u> customer self-service inquiries and
is sometimes considered the 'voice' of an automated
customer contact center."  Vista Pre-Installation Guide
at ¶ 4 (Doc. No. 90-1) (emphasis added); <u>see also id</u>. at
¶ 4.1 ("Your Vista IVR System is an industry standard
server/workstation   containing   specialized   voice-

_____

        (...continued)
the Syntellect-produced "Infobot" IVR.


        3.  The document cited by the court as the "RFP"
contains Colonial's request for proposal and Syntellect's
response.

4

processing hardware, voice-processing application(s), and various optional features to deliver a wide variety of automated transactional services to your customers.").

Syntellect's response to Colonial's RFP also stated that, "Inclusion of Project Management is mandatory with each system sold." RFP at 6. Project Management was described as "includ[ing] guiding the customer through the development phases of the ... Functional Specification [of the IVR]." Id.; see also id. at 8 ("Prior to system installation, the Project Manager assists in the development of the customer's Functional Specification."). Syntellect explained that, "The Project Manager provides advice and examples in order to empower the customer to create their own Functional Specification." Id. at 8; see also id. at 6 ("Although it is the customer's responsibility to provide the Functional Specification, sample scripts are available to assist them.").

Colonial eventually selected Syntellect as its IVR vendor.  As indicated in Syntellect's response to the RFP, "Syntellect's project manager [then] assisted Colonial Bank in the development of Colonial Bank's functional specification."  White Dep. at 56:12-16 (Doc. No. 86-7).

Prior to the installation of Vista, a "Syntellect Configuration Engineer ... complete[d] and provide[d] a Site Architecture Diagram (Site Diagram)."  Vista Pre-Installation Guide at § 3.6.1.  According to the Vista Pre-Installation Guide, "This diagram creates the foundation on which the Colonial Bank's Vista solution is built."  Id.  The diagram was then submitted to a Colonial representative, who certified that "it [was] an accurate representation of [Colonial's] network environment and intended Vista interface(s)."  Site Diagram  (Doc. No. 86-2).[4]

_____

    4.  The diagram was also included in a document titled "Colonial Bank VISTA Functional Specification,"
(continued...)

Among the written agreements between Syntellect and
Colonial is the "Vista Product Agreement."  Under the
terms of this agreement, "Syntellect grant[ed] to
[Colonial] a non-exclusive, non-transferable license to
install, use, and execute the Software."  Vista Product
Agreement at § 4.1 (Doc. No. 67-4).[5]  The agreement
further states that, "Syntellect's grant to [Colonial]
does not include any right to grant sub-licenses or
otherwise transfer such rights."  Id.  For purposes of
the agreement, "'Software' means Syntellect's and any

---

(...continued)
the final page of which states, "It is understood that
the specification defined will be used for the VISTA IVR
application development and installation," and provides
signature lines for both Syntellect and Colonial
representatives.  Functional Specification at 241 (Doc.
No. 78-4).

5. Syntellect was asked, through the RFP, to
"[p]rovide an itemized list of all the licensing
associated with the architecture."  RFP at 35.  It
responded with the following list: "• Vista IVR Licenses
• Host Interface License • Speech Recognition License •
Text to Speech License • VistaGen™ Developer Site License
(only  one per site needed) • Interactive Web Response
License."  Id.

third party's proprietary software (including telephony
and host connectivity cards) licensed to [Colonial]
pursuant to [the Vista Product] Agreement."   Id. at
§ 1.1.[6]

The Vista Product Agreement also includes the
following relevant provisions:

> "6.1 Defense Syntellect will defend, at
> its expense using counsel of its choice,
> any suit against [Colonial] claiming
> that the Software infringes any United
> States patent, trademark, copyright or
> trade secret.  Such representation is
> contingent on [Colonial] promptly
> notifying Syntellect of any such suit or
> proceeding, and giving full authority,
> information, and assistance for such
> defense.
>
> 6.2 Remedies If [Colonial] complies with
> the foregoing obligation, Syntellect
> will indemnify Customer [Colonial] for
> all losses, costs, and damages finally

_____

6.   Thus, for purposes of the agreement, the term
"software" includes some hardware.  Syntellect elsewhere
explains that, "The hardware installation consists of
installing the Syntellect supplied telephony and host
connectivity cards in the customer supplied PCs."
Syntellect's "White Paper" at 11 (Doc. No. 90); see also
White Dep. at 54:5-9 ("Q: Did Syntellect provide any
hardware[?] ... A: They provided telephony cards.").

awarded against Customer [Colonial],
subject to the limitations set forth in
Section 6.3 below. ...

6.3   Limitations   of   Infringement
Liability ... Syntellect shall not be
liable for any losses, costs, or
damages, and [Colonial] will indemnify,
defend, and hold Syntellect harmless
from any losses, costs, or damages
resulting from any suit or damages
resulting from any suit or proceeding
based on a claim arising from (1)
compliance with Customer designs,
specifications, or instructions; ... (3)
the combination, operation, or use of
the Software with any other product,
data, or apparatus not provided or
approved in writing by Syntellect or
Syntellect's authorized representative;
(4) the direct or contributory
infringement of any patent by Customer
using the Software furnished pursuant to
this Agreement; or (5) the use of a
superseded release of the Software if
the infringement would have been avoided
by the use of a current release of the
Software provided or made available to
Customer."

Id. at §§ 6.1-6.3.

Vista was installed at Colonial by December 2001.

Almost six years later, in June 2007, Ronald A. Katz

Technology Licensing, L.P. ("RAKTL") filed a complaint

9

against Colonial in the United States District Court for the Eastern District of Texas. The complaint stated, in relevant part, that RAKTL is the "sole holder of the entire right, title, and interest" in 25 specified patents. RAKTL Compl. at ¶ 56 (Doc. No. 67-16). In providing background on those patents, the complaint explained that they cover the inventions of Ronald Katz, and that, "Among [Katz's] most prominent and well-known innovations are those in the field of interactive call processing." Id. at ¶ 18. It further explained that, "Mr. Katz's inventions in that field are directed to the integration of telephonic systems with computer databases and live operator call centers to provide interactive call processing services." Id. It alleged that,

> "Colonial Bank has directly and contributorily infringed, and induced others to infringe, one or more claims of each of the ... [25 specified patents] by making, using, offering to sell, and/or selling within the United States automated telephone systems, including without limitation the Colonial Connection telephone system, that allow its customers to perform

10

> banking and customer service functions
> over the telephone."

Id. at ¶ 58.

On July 18, 2007, Colonial notified Syntellect of the RAKTL complaint, stating that, "We have identified several products that appear to be implicated by RAKTL's claims of infringement ... [including] Syntellect's voice response products known as the 'Vista' product."  Pl.'s Ex. B to Am. Compl. at 1 (Doc. No. 52-2).  Colonial also "tender[ed] its demand for indemnification and defense." Id.  Syntellect responded that "the Katz patents do not cover that which Colonial licensed from Syntellect [and] [t]herefore, Syntellect has no contractual obligation to indemnify Colonial for any alleged infringement by Colonial of Katz's patent rights."  Pl.'s Ex. C to Am. Compl. (Doc. No. 52-3).

On January 22, 2008, Colonial notified Syntellect that it would "be participating in a mediation ... with RAKTL in which a potential settlement between RAKTL and Colonial Bank will be discussed."  Pl.'s Ex. D to Am.

11

Compl. at 2 (Doc. No. 52-4).  It also "invite[d] Syntellect to attend this meeting as part of its obligation to indemnify and defend Colonial Bank in this litigation." Id.  Syntellect did not attend the meeting.

Colonial settled the RAKTL lawsuit in June 2008. Syntellect continued to reject requests for indemnification.  On December 4, 2008, Colonial filed the initial complaint in this lawsuit, claiming breach of contract and fraud.

### III.  DISCUSSION

### A.  Breach-of-Contract Claim

Count one of BB&T's amended complaint asserts a breach-of-contract claim and alleges that "Syntellect's rejection of Colonial Bank's demand for defense, indemnity, and participation in the settlement discussions [with RAKTL] was a breach of [the defense and indemnity] provisions of the VISTA Product Agreement." Am. Compl. at ¶ 27 (Doc. No. 52).  In its motion and supporting briefs, BB&T argues that there is no dispute

12

of material fact that the RAKTL "lawsuit alleged that the 'VISTA' software that Colonial Bank purchased from Syntellect infringed a patent," and thus it "requests partial summary judgment on Count [One] to resolve this issue." Pl.'s Mot. at 1-2 (Doc. No. 59). In its cross-motion and supporting briefs, Syntellect argues that there is no dispute of material fact that, "In its complaint in the underlying patent infringement lawsuit, RAKTL did not allege that the Vista software infringed its patents." Def.'s Mot. at 2 (Doc. No. 63) (emphasis added). Moreover, it argues that, "Even if RAKTL's lawsuit had come within the scope of the parties' indemnity provision, the express [limitations] to the indemnity provision in section 6.3 of the Vista Product Agreement would bar [BB&T's] claim." Def.'s Reply at 6 (Doc. No. 93).

As a preliminary matter, the court finds that Arizona law will guide its analysis of the breach-of-contract claim. The Vista Product Agreement states that it "shall

be governed by the laws of the State of Arizona." <u>Id</u>. at ¶ 11.5. "Alabama law has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement." <u>Cherry, Bekaert & Holland v. Brown</u>, 582 So. 2d 502, 506 (Ala. 1991); <u>see</u> <u>also</u> <u>Ex parte HealthSouth Corp.</u>, 974 So. 2d 288, 295 (Ala. 2007).[7]

Arizona law holds that, "When, as here, there is an express ... agreement between parties, the extent of the duty to [defend or] indemnify must be determined from that agreement." <u>MT Builders, LLC v. Fisher Roofing, Inc.</u>, 197 P.3d 758, 763 (Ariz. Ct. App. 2008). "The interpretation of a contract is generally a matter law." <u>Powell v. Washburn</u>, 125 P.3d 373, 375 (Ariz. 2006). And "[a] contract should be read in light of the parties'

───────────────────

7. The application of the agreement's choice-of-law provision to the breach-of-contract claim is not disputed. <u>See</u> Pl.'s Br. at 9 (Doc. No. 60-8) (citing only Arizona law on the issue of contract interpretation); Def.'s Resp. at 2 n.2 (Doc. No. 80) ("The parties are in agreement that Arizona law applies pursuant to an Arizona choice-of-law provision in the Vista Product Agreement.").

14

intentions as reflected by their language and in view of all the circumstances." Smith v. Melson, Inc., 659 P.2d 1264, 1266 (Ariz. 1983); see also id. at 1267 ("When interpreting an agreement, the court may always consider the surrounding circumstances."). Interpretive rules properly utilized by the court "include rules related to giving words their ordinary meaning, giving technical terms their technical meaning, reading the contract as a whole, giving effect to the main purpose of the instrument and interpreting the contract so as to make it effective and reasonable." Triangle Constr. v. Phoenix, 720 P.2d 87, 90 (Ariz. Ct. App. 1985). "[A]s with all contracts, if the meaning of the [defense or] indemnity provision remains uncertain[,] ... a secondary rule of construction requires the provision to be construed against the drafter." MT Builders, LLC, 197 P.3d at 763.

In this case, the relevant agreement expressly obligates Syntellect to "defend ... any suit or proceeding against [Colonial] claiming that the Software

15

infringes any United States patent." Vista Product Agreement at § 6.1. A corresponding remedy provision establishes Syntellect's duty to then "indemnify [Colonial] for all losses, costs, and damages finally awarded against [Colonial]." Id. at § 6.2. Both the duty to defend and the remedial duty to indemnify are contingent upon Colonial "promptly notifying Syntellect of any such suit or proceeding, and giving full authority, information, and assistance for such defense." Id. at § 6.1; see also id. at § 6.2 ("If [Colonial] complies with the foregoing obligation, Syntellect will indemnify [Colonial].").

The "remedy" of indemnification is expressly "subject to the limitations set forth in Section 6.3 [of the agreement.]" Id. at § 6.2. Titled "limitations on infringement liability," § 6.3 states that "Syntellect shall not be liable for any losses, costs or damages ... resulting from any suit or proceeding based upon a claim

16

arising from [specified circumstances]." <u>Id</u>. at § 6.3.[8]

The first issue raised by the parties' respective motions for summary judgment is properly construed as whether RAKTL's complaint triggered Syntellect's duty to defend. Unfortunately, and despite this court's prior instruction, "both parties [continue] to blur the distinction between the duty to defend and the duty to indemnify." <u>Colonial Bank v. Syntellect, Inc.</u>, 2009 WL 3219000 at *2 (M.D. Ala., Sept. 30, 2009) (Thompson, J.). As indicated by the analysis above, and as previously noted by the court, "the duty to defend and the duty to indemnify were two separate duties created by the contract." <u>Id</u>. The court addresses these duties in turn.

_____

8. Somewhat confusingly, § 6.3 also specifies those circumstances in which Colonial has a duty to defend and indemnify Syntellect. <u>See</u> <u>id</u>. ("[Colonial] will indemnify, defend, and hold Syntellect harmless from any losses, costs, or damages resulting from any suit or proceeding based upon a claim arising from [specified circumstances].").

17

## 1. Duty to Defend

Generally, a "duty to defend arises at the earliest stages of litigation and ... exists regardless of whether the [indemnitee] is ultimately found liable." INA Ins. Co. v. Valley Forge Ins. Co., 722 P.2d 975, 982 (Ariz. Ct. App. 1986). The contractual duty to defend at issue here is such a duty; it is triggered by a "suit or proceeding" that simply "claim[s] that the Software infringes any United States patent." Vista Product Agreement at § 6.1 (emphasis added).[9]

Syntellect attempts to avoid this broad contractual duty by arguing that RAKTL did not, in fact, "claim[] that the Software infringes." Rather, according to Syntellect, RAKTL "alleged [only] that 'Colonial

_____

9. For this reason, the court rejects Syntellect's contention that, "The fundamental question in this lawsuit ... is whether Vista infringes RAKTL's patents." Def.'s Br. at 17 (Doc. No. 64). As discussed below, that question is "fundamental" to BB&T's fraud claim, but it is not "fundamental" to the breach-of-contract claim.

Connection' infringed, not that Vista or the IVR infringed." Def.'s Br. at 11; <u>see</u> <u>also</u> Def.'s Reply at 1 (Doc. No. 93) ("It is undisputed that RAKTL's complaint does not mention Vista or the IVR.").

To the extent that Syntellect contends that its duty to defend is triggered only if the complaining party explicitly references the software, its argument is based on an unreasonably narrow reading of § 6.1. A civil "suit or proceeding" is initiated with a complaint, and both the Arizona and Federal Rules of Civil Procedure require only that such a pleading provide "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Ariz. R. Civ. P. 8(a)(2); Fed. R. Civ. P. 8(a)(2) (same). Under these liberal pleading rules, a lawsuit may surely "claim" that software infringes a patent without referencing the software by name. It is far more reasonable to conclude, as BB&T contends, that Syntellect's duty to defend may be triggered by a complaint that "simply describ[es] what

19

the software did." Pl.'s Resp. at 5 (Doc. No. 86).

Syntellect also contends, however, that the RAKTL complaint wass clearly directed at Colonial's entire call system, and not at its software. It is undisputed that "[t]he Colonial Connection was Colonial Bank's overall phone system," and that, "[i]t consisted of several devices in addition to Vista." Def.'s Resp. at 4. Nonetheless, the court has little difficulty concluding that RAKTL's complaint claimed that the software infringed a United States patent.[10] To be sure, the complaint was broadly directed at Colonial's operation of "automated telephone systems." RAKTL Compl. at ¶ 57. But it listed 25 patents held by RAKTL, and expansively alleged that Colonial's telephone system infringed "one or more claims of each of [them]." Id. at ¶ 58.[11] And in

_____

10. Once again, it is worth noting that for the purposes of the Vista Product Agreement the term "software" includes some hardware. See supra n.6.

11. Cf. Discover Fin. Servs. LLC v. Nat'l Union Fire
(continued...)

providing background on the relevant patents, it
explained that RAKTL's "most prominent and well-known
innovations are those in the field of interactive call
processing," and that its "inventions in that field are
directed to the integration of telephonic systems with
computer databases and live operator call centers to
provide interactive call processing." Id. at ¶ 18. By
Syntellect's own description, it is "[t]he Vista IVR
[that] automates customer self-service inquiries." Vista
Pre-Installation Guide at ¶ 4 (emphasis added).[12] Only on
the most illogical reading of the complaint could the

_____

(...continued)
Ins., 527 F. Supp. 2d 806, 822 (N.D. Ill. 2007) ("[A]
patent can be comprised of many, even hundreds of claims,
and an action for patent infringement may concern just a
single claim. RAKTL's own complaint, for example,
alleged that [the] conduct infringed 'one or more claims'
in the patents in suit.").

    12. See also Vista Pre-Installation Guide at ¶ 4.1
("Your Vista IVR System is an industry standard
server/workstation containing specialized voice-
processing hardware, voice-processing application(s), and
various optional features to deliver a wide variety of
automated transactional services to your customers.").

court conclude that it did not claim that the software infringes a patent.

The court will thus grant BB&T's motion for partial summary judgment to the extent that it "requests the Court enter an order ... holding that the RAKTL lawsuit alleged that the VISTA software infringed one of its patents." Pl.'s Br. at 8.[13] To the extent that Syntellect has moved for a contrary ruling on this issue, that motion will be denied. These rulings, however, do not end the court's inquiry.

_____

13. The court declines BB&T's invitation to conclude that ten of the patents listed in RAKTL's complaint may be construed to support a claim against Syntellect's software. Such a conclusion is more properly reached after fully construing each patent. See Markman v. Westview Instruments, 517 U.S. 370, 374 (1996) ("Victory in an infringement suit requires a finding that [a] patent claim 'covers the alleged infringer's product or process,' which in turn necessitates a determination of 'what the words in the claim mean.'"). BB&T does not offer its own construction of any patent claims, indeed it cites primarily to patent abstracts.

## 2.  Duty to Indemnify

As noted above, once Syntellect's duty to defend is triggered, a corresponding remedy provision requires it to then "indemnify [Colonial] for all losses, costs, and damages finally awarded against [Colonial]." Vista Product Agreement at § 6.2.  This "remedy" of indemnification, however, is expressly "subject to the limitations set forth in Section 6.3 [of the agreement.]" Id. at § 6.2.  In its motion for summary judgment, Syntellect contends that, "Even if RAKTL's lawsuit had come within the scope of the parties' indemnity provision, the express [limitations] to the indemnity provision in section 6.3 of the Vista Product Agreement would bar [BB&T's] claim." Def.'s Reply at 6.  In particular, it identifies the limitations provided in §§ 6.3(1), 6.3(3) and 6.3(4).

Syntellect does not explicitly address which party carries the burden of proving that one or more of the contractual limitations to the indemnification duty apply

23

in this case.[14]  "[G]enerally ... the party seeking to be indemnified has the burden of proof on the issue." Grubb & Ellis Mgmt. Servs., Inc. v. 407417 B.C., L.L.C., 138 P.3d 1210, 1215 (Ariz. Ct. App. 2006).  However, a contractual exception or limitation to an indemnity provision "is in the nature of an affirmative defense." Id. at 1215-16.  Of course, "[t]he proponent of an affirmative defense has the burden of pleading and proving it."  Id. at 1216; see also Fed. R. Civ. P. 8(c).[15]  Thus, the burden is on Syntellect to show that RAKTL's claim that the software infringes one or more claims of its patents "aris[es] from" at least one of the circumstances specified in § 6.3.

---

14. BB&T also fails to directly address this issue.

15. Syntellect appropriately pled the exceptions it raises here as affirmative defenses.  See Answer to Am. Compl. at ¶¶ 37-40 (Doc. No. 61).

a.   Section 6.3(1)

Section 6.3(1) of the Vista Product Agreement states that, "Syntellect shall not be liable for any losses, costs, or damages ... resulting from any suit or proceeding based upon a claim arising from ... compliance with Customer designs, specifications, or instructions." Syntellect claims that, "RAKTL's allegations of infringement arise from [Colonial's] provision of 'banking and customer-service functions.'" Def.'s Br. at 13 (quoting RAKTL Compl. at ¶ 58).  It further contends that "those functions were designed and specified by Colonial."  Id. at 13-14.

BB&T responds that: "The [RAKTL] case was not about ... Colonial Bank['s] specific designs, specifications, and instructions--that is, it was not about whether VISTA said 'Welcome to Colonial Bank' as opposed to 'Welcome to [some other name].'  It was about the automation itself, the central function that VISTA performed."  Pl.'s Resp. at 11.  Looking to the complaint, it is not unreasonable

to conclude that RAKTL's claim "arise[s] from" the general automated "customer-services" function that the software was designed to perform.

More importantly, BB&T also raises questions about the role Syntellect played in developing the functional specifications.   Syntellect mandates "Inclusion of Project Management ... with each system sold."   RFP at 107.   This "includes guiding the customer through the development phases of the ... Functional Specification." Id.   BB&T also offers testimony confirming that, "Syntellect's project manager assisted Colonial Bank in the development of Colonial Bank's functional specification."   White Dep. at 56:12-16.   The depth of that assistance is unclear.[16]   Drawing all inferences in

_____

16. See, e.g., White Dep. at 99:10-18 ("Syntellect provided a generic framework of a template [for how the entire IVR system functions], and we filled in our call flow and then went through and scripted all of the text that would be spoken, how all the calls would be handled, et cetera.   Q: And when you say we, who is we?   A: Primarily, it was myself working with the [Syntellect] script writer.").

26

favor of BB&T, the court cannot conclude on the existing record that Syntellect is entitled to the protection from liability provided by § 6.3(1).   Summary judgment on the basis of this provision will be denied.

### b.   Section 6.3(3)

Section 6.3(3) of the Vista Product Agreement states that, "Syntellect shall not be liable for any losses, costs, or damages ... resulting from any suit or proceeding based upon a claim arising from ... the combination, operation, or use of the Software with any other product, data or apparatus not provided or approved in writing by Syntellect or Syntellect's authorized representative."   It is undisputed that Colonial's automated call system consists of some hardware or software that was not provided by Syntellect.   This includes:

> "1) the PBX, or physical telephone lines and equipment; 2) the computer server(s) on which the Syntellect Software runs and into which calls are routed by way of the ports; 3) a call routing and

27

> reporting system that tracks information
> regarding the volume and types of calls;
> 4) the bank's mainframe computers that
> contain and secure customers' banking
> information; and 5) call center
> workstations ... which pull information
> from the mainframe computers for
> customer and agent review."

Pl.'s Br. at 11 (citation omitted); Def's Resp. at 4-5.
Syntellect maintains that it did not provide written
approval for its software to be "combin[ed], operate[d]
or use[d]" with these products.

BB&T contends, however, that Syntellect <u>did</u> approve
each of these products in writing.  As indicated in
Syntellect's Pre-installation Guide, a "Syntellect
Configuration Engineer ... complete[d] and provide[d] a
Site Architecture Diagram (Site Diagram)" prior to
installation of Vista.  <u>Id</u>. at § 3.6.1.  The Pre-
Installation Guide indicates that, "This diagram creates
the foundation on which the Colonial Bank's Vista
solution is built."  <u>Id</u>.  The diagram was then submitted
to a Colonial representative, who certified that "it is
an accurate representation of our network environment and

intended Vista interface(s)." Site Diagram. The diagram was also included in a document titled "Colonial Bank VISTA Functional Specification," the final page of which states, "It is understood that the specification defined will be used for the VISTA IVR application development and installation," and provides signature lines for both Syntellect and Colonial representatives. Functional Specification at 241. It is apparently undisputed that every relevant component of the call system is included on this diagram.

Syntellect responds that BB&T's "evidence ... shows no more than that [it] was <u>aware</u> of the other components in Colonial's call center." Def.'s Reply at 12.[17] The court is skeptical. At the very least, the evidence raises a question of fact regarding whether Syntellect "approved in writing" Colonial's use of its software with these other components.

---

17. Notably, Syntellect does not directly address the Site Diagram, instead focusing its reply on other evidence offered by BB&T as proof of written approval.

The court also rejects Syntellect's contention that, "To avoid rendering this [provision] ... meaningless, the Court should find that the evidence offered by [BB&T] does not constitute approval in writing." Id. Acceptance of the site diagram as proof of approval does not render the provision meaningless.  The limitation would still apply, for example, if Colonial had, without written approval, added components to its system after the diagram and installation were completed.

Whether § 6.3(3) applies in this case must ultimately be determined by the trier of fact.  Summary judgment on this issue will thus be denied.

### c.  Section 6.3(4)

Section 6.3(4) of the Vista Product Agreement states that, "Syntellect shall not be liable for any losses, costs, or damages ... resulting from any suit or proceeding based upon a claim arising from ... the direct or contributory infringement of any patent by [Colonial] using the Software furnished pursuant to this Agreement."

30

Syntellect contends that, "This [provision] clarifies that if [Colonial] is in any way responsible for infringing a patent, there will be no indemnity even if [Colonial] happens to be using Vista." Def.'s Reply at 13 (Doc. No. 93); see also Def.'s Resp. at 16 ("[T]his [provision] makes clear that it is not enough that the RAKTL complaint alleged [that] Colonial infringed a patent while using Vista.").

BB&T reads Syntellect as arguing that § 6.3(4) states a limitation on the duty to indemnify that excludes all suits in which Colonial is accused of infringing a patent by using the software. It persuasively responds that:

> "[This reading] would render the defense-and-indemnity provision meaningless. If Syntellect did not have to defend or indemnify Colonial Bank when it was sued for infringement for using the VISTA software, then Syntellect never had to indemnify Colonial bank in any patent infringement suit. Under the facts present in this case, it was not possible for Colonial Bank--the purchaser of the VISTA software--to be liable to anyone for the infringement of any patent unless it used the VISTA software. It is

> undisputed that Colonial Bank did not
> make the VISTA software, or sell it, or
> offer to sell it.  Only Syntellect did
> those things.  Colonial Bank simply used
> it."

Pl.'s Resp. at 17.

The notion that § 6.3(4) shields Syntellect from the duty to indemnify in all cases in which Colonial is sued for using the software is not only in conflict with the circumstances surrounding the agreement, it is impossible to square with the agreement as a whole.  The only license granted under the agreement is "to install, use, and execute the Software."  Vista Product Agreement at § 4.1 (emphasis added).  Moreover, § 6.3(5) states a limitation on the duty to indemnify for "a claim arising from ... the use of a superseded release of the Software if the infringement would have been avoided by the use of a current release of the Software provided or made available to [Colonial]."  Id. (emphasis added).  Such a limitation would be unnecessary if § 6.3(4) protected Syntellect from all claims arising from Colonial's use of

32

the software.  To the extent that Syntellect relies on
such an interpretation, its motion will be denied.

Unfortunately for Syntellect, it is not clear that it
offers any other interpretation of this provision.  See,
e.g., Def.'s Resp. at 17 ("Colonial's use of Vista is
insufficient to trigger any indemnity obligation in favor
of [BB&T]").  Thus its motion for summary judgment on
this provision of the agreement will be denied.[18]

### B.   Fraud Claim

Count two of BB&T's amended complaint asserts a fraud
claim and alleges that, "Syntellect represented, either
affirmatively  or  through  the  omission  of  relevant
information, that the software that it sold to Colonial
Bank did not violate or infringe any existing patent or

_____

18. To be clear, the court does not hold that this
provision does not apply, only that the interpretation
upon which Syntellect apparently relies is unreasonable.
The court also rejects BB&T's contention that, "The
better interpretation of Section 6.3(4)--and of Section
6.3 generally--is that it relates [only] ... to cases in
which Syntellect is a defendant."  Pl.'s Resp. at 18.

copyright." Am. Compl. at ¶ 30. It further alleges
that, "That representation was false, because the
software infringed the patents that were the subject of
the RAKTL action." Id. at ¶ 31. Syntellect argues that
summary judgment is due because BB&T offers no evidence
that the alleged representation is false.[19]

As a preliminary matter, the court finds that Alabama
law will guide its analysis of BB&T's fraud claim.
"Alabama adheres to the traditional rule of 'lex loci
delicti,' which provides that an Alabama court will
determine the substantive rights of an injured party
according to the law of the state where the injury
occurred." Williams v. Norwest Fin. Ala., Inc., 723 So.
2d 97, 101 (Ala. Civ. App. 1998). "[W]here documents
executed by the parties contain a choice-of-law clause[,]

_____

19. Syntellect also argues that: (1) it did not make
the alleged representation; (2) BB&T's fraud claim is
barred by the relevant statute of limitations; and (3)
BB&T's claim failed to meet the heightened pleading
requirements of Federal Rule of Civil Procedure 9(b).
Because the court will grant summary judgment on other
grounds, it does not address these arguments.

34

an exception to the rule of 'lex loci delicti' [may] exist[]." <u>Id</u>. However, when the "claims sound in tort and allegedly arise from the facts and circumstances surrounding the making of the ... agreement ... the choice-of-law clause does not supersede the rule of 'lex loci delicti.'" <u>Id</u>.; <u>Bowling v. Founders Title Co.</u>, 773 F.2d 1175, 1179 (11th Cir. 1985) ("Alabama choice of law principles in tort and fraud look primarily to the law of the state where the injury occurs--in this case, Alabama."). To the extent that Colonial was injured as a result of the alleged misrepresentation, that injury occurred in Alabama.[20]

In Alabama, "A fraud claim may involve an alleged affirmative misrepresentation of a material fact or an alleged concealment of a material fact for which there is a duty to disclose." <u>Brown v. K&V Automotive, Inc.</u>, 946 So. 2d 458, 464 (Ala. Civ. App. 2006). "A party alleging

_____

20. The court notes, however, that it would reach the same result under Arizona law. <u>See</u> infra n.22.

fraud by misrepresentation must prove four elements."

Luck v. Primus Auto. Fin. Servs., 763 So. 2d 243, 245

(Ala. 2000).  These elements are:

> "(1) that the defendant made a false
> representation concerning an existing
> material fact; (2) that the defendant
> made that misrepresentation while
> knowing that it was false, or made it
> recklessly, or made it with no knowledge
> as to its truth or falsity; (3) that the
> plaintiff reasonably relied on the
> misrepresentation; and (4) that the
> plaintiff incurred damage proximately
> caused by the reliance."

Id. at 245-46.  A party alleging fraud by omission must

also prove four elements:

> "1) that the defendant had a duty to
> disclose material facts, 2) that the
> defendant concealed or failed to
> disclose those facts, 3) that the
> concealment or failure to disclose
> induced the plaintiff to act; and 4)
> that the defendant's action resulted in
> harm to the plaintiff."

Jewell v. Seaboard Indus., 667 So. 2d 653, 658 (Ala.

1995).  As should be clear, whether proceeding under a

theory of misrepresentation or omission, the party

36

alleging the fraud must prove the existence of a "material <u>fact</u>."

In response to the motion for summary judgment, BB&T contends that, "There ... are ample facts to support the substance of the claim." Pl.'s Resp. at 20. Yet the only evidence it offers is Syntellect's answer to "Colonial Bank's request for ... an itemized list of all the licensing <u>associated</u> with the VISTA IVR system." Pl.'s Resp. at 20 (emphasis added). BB&T maintains that Syntellect committed fraud when its answer "failed to [indicate] that Colonial Bank needed a license from [RAKTL]." <u>Id</u>. at 21.[21]

_____

21. It is questionable whether a request for "an itemized list of all the licensing associated with the architecture" can properly be construed as a request for all the licensing <u>necessary</u> to legally use the software. <u>See</u> Def.'s Reply at 15 ("[Syntellect's] interpretation of the question is plainly false: the question calls for all licenses <u>actually</u> associated with Vista, not those <u>necessary</u> to run Vista." (emphasis in original)). Moreover, Syntellect argues persuasively that "the parties were sufficiently sophisticated to contemplate the risk of patent infringement, and [Colonial,] instead of asking for a representation of non-infringement, (continued...)

What BB&T does not do is offer any evidence that Colonial in fact "needed a license from [RAKTL]" to legally use the software. In fact, it explicitly takes the position that whether "VISTA ... actually infringe[s] [RAKTL's] patents ... is irrelevant." Id.; see also id. at 22 ("That inquiry is inappropriate and unnecessary. It is not an issue in the case."). To be sure, actual infringement may be irrelevant to whether Syntellect had a duty to defend a <u>claim</u> of patent infringement. However, it is certainly relevant to BB&T's allegations of fraud. Because BB&T has chosen not to present evidence on this issue, summary judgment will be granted with respect to its fraud claim.[22]

_____

(...continued)
accounted for the risk of infringement through an indemnity provision." Def.'s Br. at 22.

22. The court would reach the same conclusion under Arizona law. <u>See, e.g.</u>, <u>Green v. Lisa Frank, Inc.</u>, 211 P.3d 16, 34 (Ariz. Ct. App. 2009) ("A showing of actual fraud requires [among other things]: (1) a representation [and] (2) <u>its falsity</u>.").

**\*\*\***

For the foregoing reasons, it is ORDERED as follows:

(1) Plaintiff Branch Banking and Trust Company's motion for partial summary judgment (doc. no. 59) is granted to the extent that the court finds that defendant Syntellect, Inc. had a contractual duty to defend plaintiff Branch Banking and Trust Company in the underlying RAKTL litigation.

(2) Defendant Syntellect, Inc.'s motion for summary judgment (doc. no. 63) is denied with respect to plaintiff Branch Banking and Trust Company's breach-of-contract claim and granted with respect to plaintiff Branch Banking and Trust Company's fraud claim.

(3) Judgment is entered in favor of defendant Syntellect, Inc. and against plaintiff Branch Banking and Trust Company on its fraud claim, with plaintiff Branch Banking and Trust Company taking nothing as to this claim.

The clerk of the court is DIRECTED to enter this document on the civil docket as a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

DONE, this the 22nd day of July, 2010.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE